**E-FILED**
Friday, 16 March, 2007  04:09:05 PM
Clerk, U.S. District Court, ILCD

05483-R3662
KEF:dkl
G:\62\R3662\R3662PMD 002

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JORDAN T. BANTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.: 06 CV 2211 |
| | ) | |
| MARY DOWDS, individually and as an | ) | |
| agent of ARTHUR I.G.A. FOODLINER, | ) | |
| an Illinois corporation; MICHAEL GOODMAN | ) | |
| Arthur Chief of Police, individually and | ) | |
| officially; and ROGER HANSEN, Arthur | ) | |
| police officer, individually and officially, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## THE AMENDED COMPLAINT

MICHAEL GOODMAN and ROGER HANSEN, by their attorneys, Heyl, Royster,

Voelker & Allen, respectfully submit this Memorandum in Support of their Motion to Dismiss

Counts I, II and III of the Amended Complaint.

### I.      BACKGROUND

On October 31, 2006, Plaintiff filed his original Complaint against Dowds and Hansen in

the United States District Court for the Central District of Illinois.  On January 19, 2007, the

Plaintiff filed his eight-count Amended Complaint, naming Michael Goodman for the first time.

Only Counts I, II and III relate to Defendants Hansen and Goodman.

Plaintiff cites 42 U.S.C. §1983 as the basis for the jurisdiction of this Court for Count I

(Amended Complaint, Par. 2).  Plaintiff cites 28 U.S.C. §1367(a) as the jurisdictional basis for the

purported state court claims of malicious prosecution found in Counts II and III (Amended

Complaint, Par. 3).

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

Count I purports to be a §1983 claim against Officer Hansen for violation of Plaintiff's Fourth Amendment rights. Plaintiff appears to premise Count I on an alleged false arrest theory. Count I does not state whether the 1983 claim is against Officer Hansen in his official or individual capacity.

Count II purports to be a state court malicious prosecution claim against Officer Hansen. Count III purports to be a state court malicious prosecution claim against Chief Goodman.

On October 31, 2005, Plaintiff was tried before a jury for the underlying crime of theft in the Circuit Court for the Sixth Judicial Circuit of Illinois, Moultrie County, Sullivan, Illinois. The case number assigned to that charge was 05-CM-86. A true and correct sworn copy of the "Report of Proceedings at Jury Trial" for that matter is attached hereto as Exhibit A.

## II.    ARGUMENT

### A.    Officer Hansen had probable cause that the Plaintiff committed a theft.

A police officer has probable cause to make an arrest when the facts and circumstances within his knowledge and of which he has reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense. *Gaskins v. City of Rock Island, et al.*, 2006 WL 1793578(CD Ill.). The rule of probable cause is a "practical, non-technical conception" that affords the "best compromise" between the interests of individual liberty and effective law enforcement. *Woods v. City of Chicago*, 234 F.3d 979, 996, 55 Fed. R. Evid. Serv. 912 (7th Cir. 2000). Contrary to what its name might seem to suggest, probable cause "demands even less than 'probability'". *Id.* Probable cause "requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officers believe it is more likely true than false." *Id.*

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

2

In applying this standard, the Seventh Circuit has consistently held that an identification or report from a single, credible victim or eye witness can provide the basis for probable cause. *Id.* "When an officer has 'received information from some person - - normally the putative victim or an eye witness - - who it seems reasonable to believe is telling the truth' he has probably cause." *Taylor v. Henson*, 61 F.3d 906, 1995 WL 411879 (7th Cir. (Ill.)); *see also Grimm v. Churchill*, 932 F.2d 674, 675 (7th Cir. 1991).

The Plaintiff's Amended Complaint includes allegation which provide the probable cause necessary for Officer Hansen to conclude that the Plaintiff committed the crime of theft. Under Illinois law, the crime of theft is a person commits theft when he knowingly:

(1)    obtains or exerts unauthorized control over property of the owner; or

(2)    obtains by deception control over property of the owner; or

(3)    obtains by threat control over property of the owner; or

(4)    obtains control over stolen property knowing the property to have been stolen or unde such circumstances as would reasonably induce him to believe that property was stolen; or

(5)    obtains or exerts control over property in the custody of any law enforcement agency which is explicitly represented to him by any law enforcement officer or any individual acting on behalf of a law enforcement agency as being stolen; and

    (A)    intends to deprive the owner permanently of the use or benefit of the property; or

    (B)    knowingly uses, conceals or abandons the property in such a manner as to deprive the owner permanently of such use or benefit; or

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

3

(C)    uses, conceals or abandons the property knowing such use, concealment or

abandonment probably will deprive the owner permanently of such use or

benefit.

720 ILCS 5/16-1. West (2006).

In Count VII of Plaintiff's Amended Complaint, he asserts a purported cause of action for malicious prosecution against Mary Dowds. In it, he admits that on June 29, 2005, Ms. Dowds filed a complaint with the Arthur Police Department against the Plaintiff alleging the theft of items from the I.G.A. store. (See amended Complaint, Count VII, Par. 8). In Count I of Plaintiff's Amended Complaint, Plaintiff admits that on June 29, 2005, Officer Hansen began to investigate the complaint of Ms. Dowds against the Plaintiff, in which she alleged that the Plaintiff stole several items from the Defendant, Arthur I.G.A. Foodliner grocery store, where both Dowds and Plaintiff worked at the time. (See Amended Complaint, Count I, Par. 1). Plaintiff additionally admits that Officer Hansen wrote in his report that he spoke with Dowds who told him that she saw Plaintiff committing the alleged theft between 7:30 p.m. and 8:00 p.m. on June 25, 2006 (sic). (See Amended Complaint, Count I, Par. 2).

Under the standards set forth above, the Plaintiff has admitted that there was a credible, independent witness who identified the Plaintiff as the perpetrator of a theft of items from the I.G.A. food store. Specifically, Plaintiff's Amended Complaint asserts that Ms. Dowds complained of a theft, namely: that the Plaintiff knowingly obtained and exerted unauthorized control over items from the Arthur I.G.A. Foodliner grocery store. These facts constitute a factual basis for probable cause.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

**B.    The existence of probable cause bars Plaintiff's claim for a violation of his Fourth Amendment rights.**

Probable cause is a complete defense to a false arrest claim under the Fourth Amendment. *Biddle v. Martin*, 992 F.2d 673, 678 (7th Cir. 1993). As is illustrated above in paragraph A of the argument, the Plaintiff's Amended Complaint itself asserts a factual basis for a finding of probable cause. Thus, Count I of the Plaintiff's Amended Complaint must be dismissed

**C.    The fact the Plaintiff was never seized defeats any claim for a violation of his Fourth Amendment rights against Officer Hansen.**

Under federal law, when a person alleges that their Fourth Amendment rights have been violated by false arrest, the injury occurs at the time of the arrest. *Wallace v. City of Chicago*, 440 F.3d 421, 425 (7th Cir. 2006). A person has been "seized" [arrested] within the meaning of the Fourth Amendment only if, in view of all the circumstances surround the incident, a reasonable person would have believed that he was not free to leave. *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998). A §1983 action cannot be sustained unless the person charged with the violation caused or participated in the alleged constitutional deprivation. *Id.* In *Keating*, the Seventh Circuit noted that Keating did not arrest the Plaintiff in that case. The only thing Keating did was to perform the act of signing the criminal complaint against the Plaintiff to bring her before the Court. In that case, the Seventh Circuit concluded as follows, "We cannot conceive of a way in which Officer Keating caused, or participated in, Jenkins' [the plaintiff's] arrest."

In the instant case, the Plaintiff was <u>never</u> arrested. The Plaintiff's claim is therefore based on the summons that the Moultrie County Court sent him to make him appear at a court hearing. The United States Supreme Court laid the foundation for the Seventh Circuit to conclude that a summons does not constitute an arrest in the case of *United States v. Dionisio*, 410 U.S. 1, 9, 93 S. Ct. 764, 769, 35 L. Ed. 2d 67 (1973). In *Dionisio*, the Supreme Court ruled that it is clear that

HEYLROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

a subpoena to appear before a Grand Jury is not a "seizure" in the Fourth Amendment sense, even though that summons may be inconvenient or burdensome. Utilizing that logic as a foundation, the Seventh Circuit ruled in *Mahoney v. Kesery*, 976 F.2d 1054, at 1060 (7th Cir. 1992), that the summons which compelled the Plaintiff, Mahoney, to appear for a required court appearance did not rise to the level of a seizure. *Id.* The Court stated that being required to appear at a court hearing did not violate his Fourth Amendment rights any more than "having to show up at the motor vehicle bureau to take a driving test in order to get a drivers license" would. *Id.* The Court then specifically went on to note that "it is less dramatic, less traumatic than being arrested, or booked, the first usually involving being searched and handcuffed, the second being searched, fingerprinted, and photographed." *Id.* Based on the allegations of the Plaintiff's Amended Complain in Count I, Par. 6, the Plaintiff was simply summoned to the courthouse for a required hearing. Pursuant to the United State Supreme Court's logic of *Dionisio* and the Seventh Circuit's logic in *Mahoney*, the Plaintiff was never arrested/seized in a way that violated his Fourth Amendment rights in the first place. Thus, the federal §1983 claim in Count I must be dismissed.

> **D.     The existence of probable cause entitles Officer Hansen qualified immunity from Plaintiff's claim for a violation of his Fourth Amendment right.**

The doctrine of qualified immunity shields public officials performing discretionary functions from liability for civil damages where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jones v. Watson*, 106 F.3d 774 (7th Cir. 1997). The doctrine serves the purpose of protecting public officials from undue interference with their duties and from potentially disabling threats of liability. *Id.* In the specific context of a damages action brought under 42 U.S.C. §1983 stemming from a warrantless arrest, the arresting officers will be immune from liability if a reasonable officer could have believed the

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

Plaintiff's arrest to be lawful, in light of clearly established law and the information the arresting officers possessed. *Id.*

As has been pointed out in the sections above, this case does not involve an arrest. However, if this Court was inclined to conclude that a summons constitutes a seizure contrary to the teachings of *Dionisio* and *Mahoney*, the claim against Officer Hansen still must be dismissed because he is entitled to qualified immunity as a matter of law based on the existence of probable cause to arrest for the crime of theft.

Officers are entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to support an arrest. *Id.* Significantly, "even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Id.* Even if probable cause was lacking, the arresting officers are entitled to immunity as long as their belief was reasonable. *Id.*

Immunity ordinarily should be decided by the Court long before trial. *Biddle v. Martin*, 992 F.2d 673 (7th Cir. 1993). In that analysis, the Court should ask whether the officers acted reasonably under the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed long after the fact. *Id.* If a case involves the question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed. *Id.* Consequently, if reasonable police officers would have believed that probable cause existed to arrest the Plaintiff, then the defendant officers are entitled to qualified immunity from suit. *Id.*

Thus, when a supermarket security guard witnesses an individual shoplifting, and police arrest the individual based on the guard's report, qualified immunity shields the arresting officer from §1983 liability. *Jenkins v. Keating* at 585. As stated above, the Plaintiff's Amended

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

Complaint in Counts I and Count VII clearly provide a factual basis that was provided to Officer Hansen by a witness for purposes of establishing probable cause that the Plaintiff committed the offense of theft. Given those facts, reasonable officers would have believed that probable cause existed to arrest the Plaintiff. Thus, Hansen is entitled to qualified immunity from Plaintiff's suit. Again, there was no arrest in this case. Officer Hansen simply placed information in a police report and forwarded that report to the Moultrie County State's Attorney's Office. As is seen above, that does not constitute an arrest or seizure; however, even if there was an actual arrest in this case, Officer Hansen's conduct would be shielded by qualified immunity. Thus, Count I must be dismissed.

> **E.    The factual basis for the conclusion that Officer Hansen "fabricated evidence" and "omitted exculpatory" evidence is irrelevant and immaterial.**

In Count I, Plaintiff alleges that Officer Hansen "fabricated evidence in his police report regarding Kauffman driving Plaintiff to his residence." (See Amended Complaint, Count I, Par. 4). The gravamen of the allegations of paragraph 4 of Count I tends to suggest that the fabrication alleged created a contradiction in the Plaintiff's story. (Amended Complaint, Count I, Par. 4).

Similarly, in paragraph 5 of Count I, Plaintiff asserts that Officer Hansen omitted exculpatory fact from his report. Specifically, Plaintiff asserts that Officer Hansen omitted information, including the allegation that the Plaintiff was with a friend during the time frame that Co-Defendant Dowds alleged that Plaintiff was at the store. (Amended Complaint, Count I, par. 5).

Both of the foregoing assertions are utterly irrelevant and immaterial to the analysis of whether the Plaintiff committed the theft. The allegations in paragraph 4 don't have anything to do with whether or not he actually committed the theft. The only issue that is raised there questions

**HEYLROYSTER**
**VOELKER**
**&ALLEN**

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

the Plaintiff's credibility in general, not whether he committed the act of theft at the I.G.A. grocery store.

The only way that the assertions in paragraph 5 of Count I are relevant, is if the Plaintiff denied ever returning to the store for purposes of rummaging through the store's trash. The clear implication from paragraph 5 of Count I is that as a result of the Plaintiff allegedly being "in (Kauffman's) house and car, during the time from 7:30 p.m. to 8:00 p.m. on June 25, 2005, the exact time that Dowds alleged (and Hansen wrote in his report) Plaintiff was present at the Arthur I.G.A. store committing the theft", the Plaintiff could not have been at the store committing the theft. In other words, they identified the wrong guy. This is disingenuous.

The Plaintiff has already testified under oath at the underlying criminal trial that once he left the I.G.A. store after his shift concluded, he returned to the I.G.A. grocery store, proceeded to the rear of the building by the trash, and rummaged through the trash area collecting what he believed to be "garbage" cigarettes. Specifically, Plaintiff has already admitted under oath at the trial of the underlying charge of theft that after he left the store following his shift, he went to the library. (See Ex. A, p. 66, lines 2 - 4). Plaintiff then admits to having left the library and walked back to the rear of the store to the trash area to retrieve items out of the trash. (See Ex. A., p. 66, lines 2 - 8; p. 67, lines 11 - 19). Based on the foregoing, the Plaintiff has admitted to facts which place him at the store in the garbage, rummaging for at least cigarettes. Whether he was there at 6:30 or 7:00 or 7:30 or 8:00, is irrelevant and immaterial to the underlying charge of theft. The implication in paragraphs 4 and 5 of Count I are false and inaccurate. There is no issue as to whether the Plaintiff returned to the store after his shift to rummage through the garbage bags. The only issue is whether the Plaintiff at that moment was knowingly obtaining or exerting unauthorized control over property of the owner. The perceived difference in story by Officer Hansen as asserted in paragraph 4, as

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

well as the time frames asserted in paragraph 5, have nothing to do with the underlying charge of theft.

**F.      The existence of probable cause bars Plaintiff's state court claim for malicious prosecution against Officer Hansen.**

In an action for malicious prosecution under Illinois law, the elements which must be alleged and proven are as follows: (1) the commencement or continuation of an original or criminal judicial proceeding by the Defendant; (2) the determination of the prosecution in favor of the Plaintiff in a manner indicative of the innocence of the Plaintiff; (3) the absence of probable cause for such proceedings; (4) the presence of malice; and (5) damages resulting to the Plaintiff. *Joiner v. Benton Community Bank*, 82 Ill.2d 40, 45, 411 N.E.2d 229, 232 (Ill. 1980).

As the Illinois Supreme Court indicated in *Joiner*, "the absence of probable cause for such proceeding" is essential to the Plaintiff's prima facia case for malicious prosecution.  As has been fully established above in the preceding sections of the argument, Officer Hansen possessed a factual basis which constituted probable cause that the Plaintiff committed a theft.  Thus, the Plaintiff can never establish the "absence of probable cause for such proceeding."  The proceeding for which he is complaining is the criminal proceeding relating to the theft charges.  As is set forth above, Plaintiff's own Amended Complaint in Count I and Count VII provides the factual basis for the Court to conclude that probable cause existed for the theft.  Certainly the Plaintiff's admissions as set forth in his trial testimony on the underlying charges place him at the scene of the incident in the trash, as was alleged by the witness who complained to the officer who recorded it in his police report and forwarded that on to the prosecutor's office.  The Plaintiff's claim in Count II against Officer Hansen for malicious prosecution must be dismissed.

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

**G.    The existence of probable cause bars the Plaintiff's state court claim for malicious prosecution against Chief Goodman.**

The analysis which is set forth in paragraph F and the other sections above applies with equal force here. The same probable cause which establishes that the Plaintiff can never state a malicious prosecution claim against Officer Hansen also establishes a bar of that claim against Chief Goodman. With respect to Chief Goodman, the bar is even more compelling because there simply is no active involvement whatsoever on the part of Chief Goodman alleged in Plaintiff's Amended Complaint. Obviously, the allegations which assert significantly less involvement - in fact no involvement - by Chief Goodman must be barred by the probable cause which bars the claim against Officer Hansen.

**H.    The Plaintiff's purported claim against Arthur Chief of Police Michael Goodman ("Goodman") is barred by the statute of limitations.**

In his claim against Michael Goodman as Chief of Police of the Village of Arthur, the Plaintiff has asserted his action against an individual employed by a local governmental employee employed by a local governmental entity. As such, the statute of limitations set forth in 745 ILCS 10/8-101 applies to this claim. Section 10/8-101 states as follows:

> **Limitation.**    (a)    No civil action other than an action described in subsection (b) may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued. (West 2007).

Under Illinois law, a claim for malicious prosecution accrues when the criminal proceeding against the arrestee/Plaintiff terminates. *Ferguson v. City of Chicago*, 213 Ill.2d 94, 820 N.E.2d 455 (Ill. 2004). Plaintiff's Amended Complaint admits that the underlying criminal trial for theft was convened and terminated on October 31, 2005. (Amended Complaint, Count I, Par. 7). Thus, given the one-year statute of limitations set forth above, the Plaintiff had until October 31, 2006 to file his complaint against either Officer Hansen or Chief Goodman. As the Court's official docket

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

entry and the Amended Complaint illustrate, the claim against Chief Michael Goodman was not instituted until January 19, 2007, nearly three months after the statute of limitations had run. Accordingly, Plaintiff's claim against Chief Michael Goodman for the offense of malicious prosecution is time bared and must be dismissed. Thus, Count III must be dismissed.

### I.    Count III fails to state any cause of action against Chief Goodman.

Notwithstanding the arguments in Sections G and H above, there is an additional foundation for the dismissal of Count III against Chief Goodman. There is nothing in Count III which states either any facts or legal theory which provide a route to liability to Chief Goodman. There is nothing that places Chief Goodman on notice in any way, shape or form of what the nature of the claim is against him. Accordingly, Count III fails to state a cause of action and must be dismissed.

### J.    Count II against Officer Hansen and Count III against Chief Goodman must be dismissed because of the immunity established by the Illinois Local Governmental and Governmental Employees Tort Immunity Act.

The following is set forth under 745 ILCS 10/2-202 (West 2007):

**Execution or enforcement of law.**  A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes will ful and wanton conduct.

The Immunity Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2007).

Where the Court finds that the facts in possession of the officer(s) constitute probable cause, the probable cause clearly negates any Plaintiff's allegations that the officers acted in a willful and wanton manner. *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 320, 308 Ill.Dec. 248 (1st Dist. 2006).

HEYL ROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

As such, §2-202 of the Immunity Act provides the officers with immunity from any liability resulting from their interaction with the Plaintiff following the alleged offense. *Id.*

Based on the rationale of the Illinois Appellate Courts, the existence of probable cause as set forth in the sections above establishes that neither Officer Hansen nor Chief Goodman could have acted in a willful and wanton manner, and therefore, are entitled to the immunity set forth in the Local Governmental Immunity Act. Thus, Counts II and III must be dismissed.

WHEREFORE, the Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety and for any other relief this Court deems fit.

> MICHAEL GOODMAN and
> ROGER HANSEN, Defendants
>
> s/ James C. Kearns
> Attorney for Defendants
> Heyl, Royster, Voelker & Allen
> Suite 300
> 102 E. Main Street
> P.O. Box 129
> Urbana, IL 61803-0129
> 217-344-0060 Phone
> 217-344-9295 Fax
> E-mail: jkearns@hrva.com

HEYLROYSTER
VOELKER
&ALLEN

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2007, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the following:


Mr. Jason R. Craddock
P.O. Box 1514
Sauk Village, IL  60412

Ms. Lorna K. Geiler
Meyer Capel, P.C.
P.O. Box 6750
Champaign, IL  61826-6750


s/ James C. Kearns
Attorney for Defendants
Heyl, Royster, Voelker & Allen
Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
217-344-0060 Phone
217-344-9295 Fax
E-mail: jkearns@hrva.com

**HeylRoyster**
**Voelker**
**&Allen**

Suite 300
102 E. Main Street
P.O. Box 129
Urbana, IL 61803-0129
Fax (217) 344-9295
(217) 344-0060

05483-E-FILED
Friday, 16 March, 2007 04:11:01 PM
Clerk, U.S. District Court, ILCD

1          IN THE CIRCUIT COURT
   FOR THE SIXTH JUDICIAL CIRCUIT OF ILLINOIS
2          MOULTRIE COUNTY, SULLIVAN, ILLINOIS

3    THE PEOPLE OF THE              )
     STATE OF ILLINOIS              )
4                                   )
          vs.                       )
5                                   )
     JORDAN T. BANTON,              )    No. 05-CM-86
6                                   )
          Defendant.                )
7

8          **REPORT OF PROCEEDINGS AT JURY TRIAL**

9          BE IT REMEMBERED, that the above-entitled cause came on

10   for hearing on the 31st day of October 2005, before the Hon.

11   Dan L. Flannell, Circuit Judge, AND A JURY.

12

13   APPEARANCES:          Mr. Darrell S. Price
                           Assistant State's Attorney
14                         Moultrie County Courthouse
                           Sullivan, IL   61951

15                              On Behalf of the People;

16                         Mr. Jason R. Craddock
                           Attorney at Law
17                         Box 1514
                           Sauk Villiage, IL   60411
18
                                On Behalf of the Defendant
19

20         WHEREUPON the following proceedings were had and

21   entered of record in said cause:

22

23                MARY BETH ROLLINS, C.S.R., R.P.R.
                      Official Court Reporter
                      C.S.R. No. 0084-1697
24                      Sullivan, Illinois


                              1     **Mary Beth Rollins, C.S.R.**

# INDEX

**Opening Statements**
        Mr. Price......................................... 8
        Mr. Craddock...................................... 10


**People's Witnesses:**

Mary Dowds
        Direct Examination by Mr. Price ....................... 12
        Cross Examination by Mr. Craddock..................... 26
        Redirect Examination by Mr. Price..................... 34

Rena Vincent
        Direct Examination by Mr. Price ....................... 55
        Cross Examination by Mr. Craddock..................... 57


**Defendant's Witnesses:**

Jordan Banton
        Direct Examination by Mr. Craddock.................... 59
        Cross Examination by Mr. Price........................ 71
        Redirect Examination by Mr. Craddock ................. 76
        Recross Examination by Mr. Price ..................... 77
        Further Direct Examination by Mr. Craddock ........... 85

Jonathan Kauffman
        Direct Examination by Mr. Craddock.................... 78
        Cross Examination by Mr. Price........................ 81

John Beck
        Direct Examination by Mr. Craddock.................... 83

Leslie Rhoads
        Direct Examination by Mr. Craddock.................... 87

Jury Instruction Conference.......................... 92

**Closing Arguments**
        Mr. Price......................................... 98
        Mr. Craddock......................................103
        Mr. Price.........................................109

**Court Instucts the Jury...............................111**

**Verdict............................................120**

**EXHIBITS**

People's Exhibits 1 through 8 Entered into Evidence    44

1          THE COURT:  Gentlemen, I presume you are going to

2     enforce having the witnesses excluded during the course of

3     voir dire.  Any party that's a potential witness in the case

4     of People versus Banton, step outside the courtroom.

5          Ladies and gentlemen of the jury, you have been called

6     here today to sit as jurors in the case of the People of the

7     State of Illinois versus Jordan Banton.  I would like to

8     talk to you about some basic principles of law that apply to

9     all cases.

10          These are not your final and complete

11     instructions.  Those will come after you have heard the

12     evidence and final arguments of the attorneys.  When the

13     time for giving instructions is at hand, I will read them to

14     you and you will receive them in writing along with verdict

15     forms.  You must follow the law as I give it to you.  You

16     may not use your own ideas what the law should or may be.

17     The defendant in this case, Jordan T. Banton, is charged

18     with the offense of theft.  The following persons are

19     anticipated to testify.  First of all, he has pled not

20     guilty.

21          The following persons are anticipated to testify at

22     trial or expected to testify at trial.  Not all of these

23.     persons may ultimately be called to the stand to testify.

24     The reason for listing these persons is we will be

2     **Mary Beth Rollins, C.S.R.**

```
1              THE COURT:  Mr. Craddock, ready to present your

2   witnesses?

3              MR. CRADDOCK:  Yes.

4              THE COURT:  I call Jordan Banton.

5                          JORDAN BANTON,

6   the defendant, called as a witness in his own behalf, after

7   being first duly sworn by the Clerk, testified as follows:

8                       DIRECT EXAMINATION

9                       BY MR. CRADDOCK:

10       Q     State your name please?

11       A     Jordan Banton.

12       Q     How old are you Jordan?

13       A     17.

14       Q     Where do you live?

15       A     Pierson Station, Illinois.

16       Q     Were you an employee at the Arthur IGA store?

17       A     Yes.

18       Q     About how long did you work there?

19       A     Probably three or four months.  Maybe five.

20       Q     Were you working there on June 29th?

21       A     Yes.

22       Q     What was -- what shift were you working on that

23   day?

24       A     I think I was scheduled to work 3:00 to 7:30.
```

```
 1          Q    What were your duties there?

 2          A    Help people out with their groceries.  Clean up.

 3     Stock the shelves.

 4          Q    And who was your direct supervisor?

 5          A    Direct supervisor that night would have been Mary

 6     Dowds.

 7          Q    Was she the only one?

 8          A    That night, yes.

 9          Q    Do you recall, have you worked -- did you work

10     other days where Mary was your direct supervisor?

11          A    Yeah.

12          Q    About how much of the time approximately?

13          A    I had just started working nights.  I was working

14     days.  Every night that I was working nights.  Probably

15     three or four nights I had been working nights.  I started

16     that week.

17          Q    In the three or four months, about how often would

18     you say you worked under Mary?

19          A    Probably four or five times.

20          Q    Did you get along with her?

21          A    No.

22          Q    Why not?

23          A    She -- I couldn't hear out of one ear because she

24     talks quiet.  She called me retarded when I asked her what
```

60     **Mary Beth Rollins, C.S.R.**

1    she said.  And she followed me around the store and redo

2    everything that I had done.  And just being unkind pretty

3    much.

4         Q    Did she ever give a reason why?

5         A    No.  Said I was stupid.

6         Q    Was she acting that way towards you on June 29th?

7         A    No.

8         Q    How was she treating you on that day?

9         A    More friendly.  Just totally different than it had

10   been the whole time I was working there.

11        Q    What were your assigned duties on June 29 when you

12   were working at the store?

13        A    To stock the shelves.  That's what we did first

14   and take out the garbage.  It was me, L.J. and Jonathan did

15   that.  I think Mary was even helping with that.  She told me

16   to clean the break room and bathrooms.

17        Q    When you took out the garbage, what was the

18   process you engaged in that day to take out the trash?

19        A    First, I went to produce, took the garbage out of

20   the can, put it on the cart.  Went to the front, took all

21   the bags out of the registers.  Put them in a large black

22   bag.  And then one of those bags -- I don't remember which

23   register -- there was two cartons of cigarettes in it.

24        Q    You found two cartons in a trash can by a cash

                                          61    **Mary Beth Rollins, C.S.R.**

1    register?

2        A    It was under the cash register.

3        Q    Does the store normally put cartons -- unopened

4    cartons --

5        A    I don't know.  I hadn't worked that long or hadn't

6    worked nights very long.

7        THE COURT:  You need to let him finish the question

8    before you start the answer.  Can't have you both speaking

9    at once. Slow down and let him finish the questions before

10   you start your answer.

11       A    Okay.

12       THE COURT:  Counsel?

13       MR. CRADDOCK:  Q  Are you -- I am sorry.  Start the

14   question over.  When you found the two cartons of cigarettes

15   in the trash bag inside the trash can at the register, what

16   did you do?

17       A    I put it in a bigger black bag with all the other

18   trash I was picking up.

19       Q    Was there anything else in the trash bag?

20       A    It was the bag that came out of produce.  It was

21   half full of produce.

22       Q    You said they were in a trash can?

23       A    Smaller bag.  It was a small white trash bag.

24       Q    Was there anything else in the --

62    **Mary Beth Rollins, C.S.R.**

1          A    Papers, receipts, and things like that.

2          Q    Now did you at any time take the bag with the

3     cigarettes out of the black trash bag?

4          A    Not while I was on the clock, no.

5          Q    Did you at any time go into the meat locker on

6     that date?

7          A    No.  I am not supposed to be in there.

8          Q    Did you at any time take any packages of hot dogs

9     and put them in a trash bag?

10         A    No.

11         Q    Did you -- we looked at the exhibits earlier?

12         A    Yes.

13         Q    Did you see the roll of meat that was there?

14         A    I never seen that.

15         Q    Did you see it on the picture?

16         A    I seen it on the picture.

17         Q    Did you ever take that meat and put it in a trash

18    bag?

19         A    No.

20         Q    You stated you didn't take any hot dogs either?

21         A    No.

22         Q    Do those look like the cigarettes you had seen?

23         A    I think the ones in the trash can was GPC Lights

24    or something like that.  That were in the trash can.

1          Q      Did the cigarettes on the picture look like the

2      ones --

3          A      The blue --

4          THE COURT:  I want to tell you again.  Slow down.  Let

5      him finish the questions.  You are starting your answer

6      before he is finished with the question.  Slow down.  Let

7      him finish the question.  When he is done, you can start

8      your answer.  Thank you.

9          MR. CRADDOCK:  Q  As you were doing your assigned

10     duties did Mary Dowds give you any other instructions?

11         A      To clean the break room and the bathroom.

12         Q      Okay when you went to clean the break room did

13     anything unusual happen?

14         A      Yes.  She -- I cleaned it for about five or ten

15     minutes.  She come in the room.  And she told me I could

16     take a quick break for a cigarette.

17         Q      What time was this that day?

18         A      Probably around 4:30.  Something around there.

19     No.  4:45 I think.  Close to that.  Maybe 5:00 o'clock.

20         Q      Okay.  What happened next?

21         A      I sat down to have a cigarette.  She was standing

22     beside me.  She lit her cigarette.  I had my cigarette.  And

23     she started talking to me and then she sat down next to me.

24     There is chairs with rollers like an office chair.  Like

64      **Mary Beth Rollins, C.S.R.**

1   wheels on the chair.  And she rolled closer to me and

2   touched me in the -- on my -- you know.

3       Q    Did she touch your genitals?

4       A    Yes.

5       Q    Did she say anything?

6       A    Yeah.  She said, "You know you want it."  After I

7   told her to stop.

8       Q    After she touched you, you told her to stop?

9       A    Um-hum.

10      THE COURT:  Yes or no, please.

11      A    Yes.

12      MR. CRADDOCK:  Q  What happened next?

13      A    Then she stood up and unzipped her pants and

14  showed herself to me and told me -- and I got up to walk

15  away and she said, "You need to clock out right now and

16  leave."

17      Q    Did you clock out?

18      A    Yes.

19      Q    What did you do after that?

20      A    I walked through the front of the store.  I think

21  Cheryl and Rena were working.  I am not positive.  They were

22  working up front.  I walked out the door went to the

23  library.  Sat there for a few minutes to cool off.

24      Q    Let me stop you for a second.  The two cartons of

65    **Mary Beth Rollins, C.S.R.**

1    cigarettes, did you do anything with those?

2        A    Yes.  After I sat in the library for a couple of

3    minutes, I walked over from the library behind the store.  I

4    walked back because I remembered those.  I was out of

5    cigarettes.  I walked back, reached in there to get them and

6    Mary was standing outside smoking.

7        Q    You went to get these out of the dumpster?

8        A    Yes.

9        Q    Same cigarettes you found in the trash bag by the

10   register?

11       A    Yes.

12       Q    Do you remember about what time it was you went

13   back to get them?

14       A    Probably around 6:00, 6:30.

15       Q    Why did you go to the library?

16       A    To cool off.  I didn't know where I was going to

17   go.

18       Q    Did you try to call the police?

19       A    I tried to call.  My cell phone doesn't work in

20   Arthur.  I tried once and sat down to think about it at the

21   library.

22       Q    Did you try to call the police from the library?

23       A    No.

24       Q    Why not?

66    **Mary Beth Rollins, C.S.R.**

1          A    Because I didn't know what to do.

2          Q    Did you at any time after you left the store take

3     your shirt off?

4          A    Yes.  It was so hot when I walking to Mr. Jonathan

5     Kauffman's house.

6          Q    Do you remember how hot it was?

7          A    Very hot.  I don't remember the exact degrees it

8     was very hot.

9          Q    96 degrees sound about right?

10         A    Yeah.

11         Q    When you were at the library, what did you do?

12         A    I got on the computer for a few minutes, trying to

13    get ahold of a friend to come and get me.  I couldn't get

14    ahold of him or anything.  So I walked back to the store,

15    got the cigarettes out of the can.  They were in the black

16    bag.  I picked up the black bag and Mary was standing

17    outside.  And she told me to come over to her, so I walked

18    over to her and handed her the bag.  And she asked me to

19    come inside and I told her I would not go inside with her.

20         Q    And then did you leave at that point?

21         A    Yes.  I walked to Jonathan Kauffman's house.

22         Q    Why didn't you want to go back inside with her?

23         A    I didn't know what she was going to do.

24         Q    Did you think she might sexually assault you

```
 1    STATE OF ILLINOIS          )

 2                               )    SS:   IN THE CIRCUIT COURT

 3    COUNTY OF MOULTRIE         )

 4

 5

 6         I, Mary Beth Rollins, Certified Shorthand Reporter,

 7    Registered Professional Reporter and Official Court Reporter

 8    in and for the Sixth Judicial Circuit of Illinois, do hereby

 9    certify that the foregoing Report of Proceedings at Jury

10    Trial in the case The People of the State of Illinois v.

11    Jordan T. Banton, Moultrie County Case No. 05-CM-86, is a

12    true and complete report of proceedings as taken by me in

13    stenograph notes and later transcribed by me.

14

15

16

17                              Mary B. Rollins

18                                   Court Reporter

19

20

21

22    DATED this 25th day

23    of February 2007.

24
```

122    **Mary Beth Rollins, C.S.R.**